## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN PETROLEUM INSTITUTE,<br>1220 L Street, N.W.<br>Washington, D.C. 20005,<br><br>CHAMBER OF COMMERCE OF<br>THE UNITED STATES OF AMERICA,<br>1615 H Street, N.W.<br>Washington, D.C. 20062,<br><br>NATIONAL MINING ASSOCIATION,<br>101 Constitution Ave, N.W.<br>Suite 500 East<br>Washington, D.C. 20001-2133,<br><br>NATIONAL ASSOCIATION OF MANUFACTURERS,<br>1331 Pennsylvania Ave., N.W.<br>Washington, D.C. 20004,<br><br>and<br><br>AMERICAN IRON AND STEEL INSTITUTE,<br>1140 Connecticut Ave., N.W., Suite 705<br>Washington, D.C. 20037 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
|                Plaintiffs, | )<br>) | Civil Action No. _____ |
|         v. | )<br>) | |
| DIRK KEMPTHORNE, Secretary of the United States<br>Department of the Interior, H. DALE HALL, Director<br>of the United States Fish and Wildlife Service, and<br>UNITED STATES FISH AND WILDLIFE SERVICE,<br>1849 C Street, N.W.<br>Washington, D.C. 20240 | )<br>)<br>)<br>)<br>)<br>) | |
|                Defendants. | )<br>)<br>) | |

## COMPLAINT

## **INTRODUCTION**

1.      Plaintiffs the American Petroleum Institute ("API"), the Chamber of Commerce
of the United States of America ("the Chamber"), the National Mining Association ("NMA"),
the National Association of Manufacturers ("NAM"), and the American Iron and Steel Institute
("AISI") (collectively "the Associations") bring this action under Section 702 of the
Administrative Procedure Act ("APA"), 5 U.S.C. § 702, seeking review of a particular provision
of a final agency action by Defendants, Dirk Kempthorne, Secretary of the United States
Department of Interior ("Secretary"), H. Dale Hall, Director of the United States Fish and
Wildlife Service ("Director"), and the United States Fish and Wildlife Service ("FWS").  On
May 15, 2008, FWS promulgated a rule listing the polar bear as a "threatened" species under the
Endangered Species Act ("ESA").  *See* 73 Fed. Reg. 28211 (May 15, 2008) (the "Listing Rule").
The Associations are ***not*** challenging the Listing Rule.  On May 15, 2008, under ESA Section
4(d), Defendants published in the Federal Register an Interim Final Special Rule amending 50
C.F.R. § 17.40 by adding a new paragraph (q). 73 Fed. Reg. 28306 (May 15, 2008) (hereinafter
the "4(d) Rule").  The Associations are challenging a discrete provision of only one paragraph of
the 4(d) Rule – the discriminatory carve-out of operations in Alaska from an exemption provided
to operations in all other states in paragraph (q)(4) of 50 C.F.R. § 17.40 (hereinafter the "Alaska
Gap").  The Associations are not challenging the remainder of the 4(d) Rule or the general
exemption provided in paragraph (q)(4), both of which they believe were properly issued under
the ESA in light of the Listing Rule.  Further, the Associations are not challenging the Guidance
published by the FWS, which interprets the 4(d) Rule.  *See* May 14, 2008, Fish and Wildlife
Service Memorandum, *Expectations for Consultations on Actions that Would Emit Greenhouse
Gases* ("FWS Guidance").  Thus, the Associations seek an order holding unlawful and vacating

2

the Alaska Gap in paragraph (q)(4) of the 4(d) Rule, 50 C.F.R.    § 17.40(q)(4), and remanding

that limited portion of the 4(d) Rule for correction of this deficiency.

2.      The Listing Rule identifies polar bears as a "threatened species" based on FWS's

determination that global climate change, resulting from increased concentrations of greenhouse

gases in the planetary atmosphere, threaten to injure polar bears' habitat by reducing polar ice.

Under the ESA and its accompanying regulations, the "threatened species" designation

presumptively triggers Section 9 of the ESA, which would require an FWS permit for activities

that constitute an "incidental taking" of the designated species.  FWS, however, also determined

that climate change is a worldwide phenomenon, resulting from the combination of greenhouse

gas emissions across the globe.  Accordingly, FWS determined that neither climate change, nor

any effect of climate change, can be traced to particular activities in particular locations.  On that

basis, FWS accompanied its Listing Rule with the 4(d) Rule, which generally exempts

greenhouse gas emitting activities from Section 9 requirements to which they might otherwise be

subject.

3.      But in a sharp contradiction with FWS's own determination that climate-change-

based effects on polar bears cannot be traced to emission activities in any particular location, the

4(d) Rule *excludes* Alaska from the Section 9 exemption.  The Alaska Gap thus exposed Alaska

operations to increased permitting burdens and/or the risk of enforcement by Government

authorities and citizen suits – risks that operations elsewhere in the United States do not face and

that are contrary to FWS's own determinations about the nature and effects of global climate

change.  The Associations therefore are challenging the Alaska Gap as an irrational exercise of

administrative authority that discriminates against Alaska operations.

## JURISDICTION

4.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  The Court has the authority to grant the relief sought herein pursuant to 28 U.S.C. § 2201 and 5 U.S.C. §§ 705, 706.

## VENUE

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) in that Defendants Dirk Kempthorne and H. Dale Hall are officers or employees of the United States who are being sued in their official capacity as the Secretary of the United States Department of Interior and the Director of the FWS, who both reside in the District of Columbia.  Venue also is proper because Defendant United States Department of Interior is an agency of the United States that has its headquarters in the District of Columbia.  Defendant FWS is an agency of the United States responsible for implementing programs and regulations to protect endangered and threatened species under the ESA and that has its headquarters in the District of Columbia.  All of the Defendants are residents of the District of Columbia and all or virtually all of the activities giving rise to this action occurred in the District of Columbia.  Finally, API and the Chamber are incorporated in the District of Columbia and all of the Plaintiffs have their headquarters or principal places of business in the District of Columbia.

## PARTIES

6.     Plaintiff API is a nationwide, non-profit trade organization representing over 400 corporate members engaged in all aspects of the oil and gas industry, including production, refining, distribution, and marketing throughout the United States, including in Alaska.  API is incorporated in and has its principal place of business is in the District of Columbia.  API's members are injured by the Alaska Gap because it imposes an irrational and additional burden on

4

their Alaska operations. As discussed in more detail below, the Alaska Gap means that otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress API's and its members' injuries.

7.     Plaintiff the Chamber is the world's largest business federation, representing an underlying membership of more than 3 million businesses and organizations of all sizes. The Chamber is incorporated in and has its principal place of business in the District of Columbia. The Chamber's members operate and have various businesses and interests in every sector of the economy and transact business throughout the United States, including Alaska, as well as in a large number of countries around the world. A central function of the Chamber is to represent the interests of its members in important matters such as clean air rules, climate change, and domestic energy production before the state and federal courts, legislatures, and executive branches. As discussed in more detail below, the Alaska Gap means that the Chamber's members' otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress the Chamber's and its members' injuries.

8.     Plaintiff NMA is the primary national organization that represents the interests of the mining industry before Congress, the administration, federal agencies, the judiciary, and the media. NMA's principal place of business is in the District of Columbia. NMA has more than 325 member corporations who are involved in all aspects of mining including coal, metal, and industrial mineral producers, mineral processors, equipment manufacturers, state associations,

5

4976589

bulk transporters, engineering firms, consultants, financial institutions, and companies that supply goods and services to the mining industry. NMA's objective is to engage in and influence the public policy process on the most significant timely issues that impact its members' ability to locate, permit, mine, process, transport, and utilize the nation's vast coal and mineral resources. NMA members operate and hold ownership interests in various mining and mineral operations in many parts of the United States, including Alaska. As discussed in more detail below, the Alaska Gap means that NMA's members' otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress NMA's and its members' injuries.

9.     Plaintiff NAM is the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states. NAM's principal place of business is in the District of Columbia. NAM's mission is to enhance the competitiveness of manufacturers by shaping a legislative and regulatory environment conducive to U.S. economic growth and to increase understanding among policymakers, the media, and the general public about the vital role of manufacturing to America's economic future and living standards. NAM members operate and hold ownership interests in various manufacturing sectors (such as the petroleum manufacturing sector) in many parts of the United States, including Alaska. As discussed in more detail below, the Alaska Gap means that NAM's members' otherwise lawful operations in Alaska – and only in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will

6

seek to enforce the provisions of ESA Section 9 against those operations. The relief the Associations request for the Alaska Gap would redress NAM's and its members' injuries.

10.    Plaintiff AISI represents the North American steel industry in the public policy arena and advances the case for steel in the marketplace. AISI's principal place of business is in the District of Columbia. AISI has approximately 28 member companies, including integrated and electric furnace steelmakers, and 138 associate and affiliate members who are suppliers to or customers of the steel industry. AISI's member companies represent approximately 75% of both U.S. and North American steel capacity. AISI's members operate and hold ownership interests in various steel manufacturing and related operations in many parts of the United States and its associate or affiliate members supply various customers and projects in the United States, including in Alaska. As discussed in more detail below, the Alaska Gap means that otherwise lawful Alaska activities or projects that AISI members supply – and only those in Alaska – may be subject to additional permitting burdens and/or a risk that Government agencies or private citizens will seek to enforce the provisions of ESA Section 9 against those activities or projects, thereby impacting the demand for steel from some AISI suppliers. The relief the Associations request for the Alaska Gap would redress AISI's and its members' injuries.

11.    Defendant Dirk Kempthorne is the Secretary of the United States Department of Interior and is being sued in his official capacity. The Secretary oversaw promulgation of the 4(d) Rule under Section 4(d) of the ESA, 16 U.S.C. § 1533(d). The Secretary signed the 4(d) Rule, which included paragraph (q)(4), and caused it to be published in the Federal Register.

12.    Defendant H. Dale Hall is the Director of the FWS and is being sued in his official capacity. The Director is responsible for the administration and implementation of the ESA.

4976589

13.    Defendant FWS is an agency of the United States with the primary authority for implementing the ESA. FWS developed and promulgated the 4(d) Rule, including paragraph (q)(4), under the direction of the Secretary and Director.

## BACKGROUND

14.    The ESA directs the Secretary to determine, by regulation, whether any species is an endangered or threatened species based on five enumerated factors. 16 U.S.C. § 1533(a)(1). The Secretary must make these determinations "solely on the basis of the best scientific and commercial data available to him . . . ." *Id.* § 1533(b). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." *Id.* § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

15.    If a species is listed as "threatened" certain protections apply. FWS has issued regulations providing that the prohibitions for endangered species under 50 C.F.R. § 17.21 (except 50 C.F.R. § 17.21(c)(5)) also apply to threatened species unless a special rule has been promulgated under ESA Section 4(d), which contains all applicable prohibitions and exemptions. 50 C.F.R. § 17.31(a), (c). For example, parties are prohibited under Section 9 of the ESA from "taking" any endangered species. 16 U.S.C. § 1538. The term "take" "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1533(19). To overcome this blanket prohibition, a private actor may seek an "incidental take permit" from the Secretary for any taking that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 17.32(b). Further, ESA Section 7 requires that any federal agency wishing to fund or

permit an activity that may affect a listed species or its habitat must engage in a "consultation" process with FWS. 16 U.S.C. §§ 1536(a)(2), 1538.

16.    FWS can promulgate special rules under ESA Section 4(d) that specify prohibitions and authorizations that are tailored to the particular species: "Whenever any species is listed as a threatened species pursuant to [the ESA], the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d).

17.    On May 15, 2008, Defendants issued the Listing Rule, which listed the polar bear as a "threatened" species under the ESA. 73 Fed. Reg. 28211 (May 15, 2008).

18.    On May 15, 2008, in conjunction with the promulgation of the Listing Rule and pursuant to its authority under ESA Section 4(d), the Secretary promulgated a 4(d) Rule for the polar bear, which amended 50 C.F.R. § 17.40 to add paragraph (q). 73 Fed. Reg. 28306 (May 15, 2008) (attached at Exhibit A). Paragraph (q) is tailored to the conservation needs of the polar bear and adopts existing conservation regulatory requirements of the Marine Mammal Protection Act and the Convention on International Trade in Endangered Species of Wild Fauna and Flora as the appropriate regulatory provisions for polar bears within the polar bear's range under certain situations. *See* 50 C.F.R. § 17.40(q); 73 Fed. Reg. at 28306.

19.    Paragraph (q)(4) of the 4(d) Rule provides: "None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within any area subject to the jurisdiction of the United States *except Alaska*." 50 C.F.R. § 17.40(q)(4) (emphasis added); *see* 73 Fed. Reg. at 28318. Thus, the 4(d) Rule exempts activities in the lower 48 states and Hawaii – but not activities in

4976589

Alaska – from claims that an otherwise lawful activity could constitute an incidental taking of polar bears that requires an incidental take permit under the ESA.

20.    The 4(d) Rule and the Listing Rule were made effective on May 15, 2008. *See* 73 Fed. Reg. at 28306; *id.* at 28212.

## APA CLAIM

21.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 20 of this Complaint.

22.    The preamble to the 4(d)Rule provides:

> There currently is no way to determine how the emissions from a specific project under consultation both influence climate change and then subsequently affect specific listed species or critical habitat, including polar bears. As we now understand them, the best scientific data currently available do[] not draw a causal connection between [greenhouse gas] emissions resulting from a specific Federal action and effects on listed species or critical habitat by climate change, nor are there sufficient data to establish the required causal connection to the level of reasonable certainty between an action's resulting emissions and effect on species or critical habitat.

73 Fed. Reg. at 28313.

23.    During the rulemaking for the 4(d) Rule, the United States Geological Survey advised FWS that it is "beyond the scope of existing science to identify a specific source of $CO_2$ emissions and designate it as the cause of specific climate impacts at an exact location." Letter from Mark D. Myers, Director, U.S. Geological Survey, to Dale Hall, Director, Fish and Wildlife Service (May 14, 2008), *available at*

http://www.fws.gov/home/feature/2008/polarbear012308/pdf/Memo_to_FWS-Polar_Bears.PDF.

24.    Based on information in the record and Defendants' recognition that the best scientific data do not demonstrate the requisite causal connection between specific actions resulting in emissions and an effect on species or critical habitat, Defendants exempted all states – except Alaska – from the otherwise applicable requirements of 50 C.F.R. § 17.31.

4976589

25.    FWS's own determination and all known science, establish that an emission in

Anchorage has no more effect on climate change or polar ice than does an emission in Ankara.

Because there is no requisite causal connection between the emissions from certain activities –

regardless of location – and the effects on a species or critical habitat, there could be no basis for

distinguishing between emissions from activities in all other states and emissions from activities

in Alaska. The Alaska Gap therefore is arbitrary and capricious and contrary to law because it is

irrational to subject Alaska operations to different and more onerous regulations concerning

greenhouse gas emissions.

26.    Defendants provided no explanation for the Alaska Gap in paragraph (q)(4) and,

thus, impermissibly neglected to provide a reasoned explanation for their decision to subject only

activities in Alaska and in no other state to the requirements for incidental takings allegedly

arising out of greenhouse gas emissions.

27.    Under the APA, the Alaska Gap is arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law.  5 U.S.C. §§ 706(2)(A).  Under APA Section 706, the

Court therefore has authority to hold the Alaska Gap unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

Plaintiffs' favor, and:

1.    Uphold the Listing Rule, the 4(d) Rule, and paragraph (q)(4) of the 4(d) Rule

*except* for the Alaska Gap in paragraph (q)(4), which should be held unlawful, vacated, and

remanded because:  (a) the Alaska Gap is arbitrary and capricious, an abuse of discretion, or

otherwise not in accordance with law under the APA; and (b) Defendants neglected to provide a

reasoned explanation for the Alaska Gap in its administrative action.

4976589

2.    Grant such other relief as the Court deems just and proper.

Respectfully submitted,

John C. Martin, D.C. Bar # 358679
Duane A. Siler, D.C. Bar # 256339
Michele L. Walter, D.C. Bar # 487329
Patton Boggs LLP
2550 M Street N.W.
Washington, D.C. 20037
Tel: 202-457-6000
Fax: 202-457-6315
jmartin@pattonboggs.com
dsiler@pattonboggs.com
mwalter@pattonboggs.com

*Counsel for Plaintiffs,*
*American Petroleum Institute, et al.*

Harry Ng, D.C. Bar # 416604
General Counsel & Group Director
American Petroleum Institute
Office of General Counsel
1220 L. Street, NW
Washington, DC 20005
Tel: (202) 682-8260

*Counsel for the American Petroleum*
*Institute*

Robin S. Conrad, D.C. Bar # 342774
Amar D. Sarwal, D.C. Bar # 476007
National Chamber Litigation Center, Inc.
1615 H Street, NW
Washington, DC 20062
Tel: (202) 463-5337

*Counsel for the Chamber of Commerce*
*of the United States of America*

4976589

Tawny Bridgeford, D.C. Bar # 489432
Associate General Counsel
National Mining Association
101 Constitution Ave, NW
Suite 500 East
Washington, D.C. 20001-2133
Tel: (202) 463-2600

*Counsel for the National Mining Association*

Jan S. Amundson, D.C. Bar # 953083
Quentin Riegel, D.C. Bar # 255521
National Association of Manufacturers
1331 Pennsylvania Ave., N.W.
Washington, D.C. 20004-1790
Tel: 202-637-3000

*Counsel for the National Association of
Manufacturers*

Barton Green, D.C. Bar # 329771
General Counsel
American Iron and Steel Institute
1140 Connecticut Ave., N.W.
Suite 705
Washington, D.C. 20037
Tel: 202-452-7100

*Counsel for American Iron and Steel Institute*

DATED: August 27, 2008

4976589

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Complaint

was served by hand delivery on August 27, 2008, upon the following:

DIRK KEMPTHORNE
Secretary of the United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

H. DALE HALL
Director of the United States Fish and Wildlife Service
1849 C Street, N.W.
Washington, D.C. 20240

UNITED STATES FISH AND WILDLIFE SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

_____
Young Woo

4976656

# Exhibit A



Thursday,
May 15, 2008

Part III

# Department of the Interior

Fish and Wildlife Service

**50 CFR Part 17**
**Endangered and Threatened Wildlife and Plants; Special Rule for the Polar Bear; Interim Final Rule**

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

[FWS-R7-ES-2008-0027; 1111 FY07 MO—B2]

**RIN 1018-AV79**

**Endangered and Threatened Wildlife and Plants; Special Rule for the Polar Bear**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Interim final rule.

**SUMMARY:** We, the Fish and Wildlife Service (Service), amend the regulations at 50 CFR part 17, which implement the Endangered Species Act, as amended (ESA), to create a special rule under authority of section 4(d) of the ESA that provides measures that are necessary and advisable for the conservation of the polar bear (*Ursus maritimus*). Elsewhere in today's **Federal Register**, we have published a final rule listing the polar bear as a threatened species under the ESA. The special rule would adopt existing conservation regulatory requirements under the Marine Mammal Protection Act of 1972, as amended (MMPA), and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) as the appropriate regulatory provisions for this threatened species. If an activity is not authorized or exempted under the MMPA or CITES and would result in an act that would be otherwise prohibited under the general prohibitions for threatened species (50 CFR 17.31), then the § 17.31 prohibitions apply and we would require authorization under 50 CFR 17.32 of our regulations.

**DATES:** This rule becomes effective on May 15, 2008. We will accept comments from all interested parties until July 14, 2008. The reasons for this accelerated implementation and for making this rule effective less than 30 days after publication in the **Federal Register** are described below in the section titled "Need for Interim Final Rule."

**ADDRESSES:** You may submit comments by one of the following methods:
• Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments.
• U.S. mail or hand-delivery: Public Comments Processing, Attn: 1018-AV79; Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, Suite 222; Arlington, VA 22203.

We will not accept e-mail or faxes. We will post all comments on *http://*

*www.regulations.gov*. This generally means that we will post any personal information you provide us (see the Public Comments Solicited section below for more information).

**FOR FURTHER INFORMATION CONTACT:** Kurt Johnson, Division of Conservation and Classification, U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Room 420, Arlington, VA 22203, telephone 703–358–2171. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339, 24 hours a day, 7 days a week.

**SUPPLEMENTARY INFORMATION:**

### Background

In the Rules and Regulations section of today's **Federal Register**, we published a final rule to list the polar bear as a threatened species throughout its range under the Endangered Species Act, as amended (ESA) (16 U.S.C. 1531 et seq.). Section 4(d) of the ESA specifies that for threatened species, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of the species. Under this authority, the Service has promulgated certain regulations in Title 50 of the Code of Federal Regulations (CFR). Specifically, 50 CFR 17.31 provides that the prohibitions for endangered wildlife under 50 CFR 17.21, with the exception of 17.21(c)(5), also apply to threatened wildlife unless a special rule has been developed under section 4(d) of the ESA. The prohibitions of 50 CFR 17.31 include, among others, take, import, export, and shipment in interstate or foreign commerce in the course of a commercial activity of a threatened species. The general provisions for issuing a permit for any activity otherwise prohibited with regard to threatened species are found at 50 CFR 17.32. The Service may, however, also develop a special rule under section 4(d) of the ESA for a threatened species that specifies prohibitions and authorizations that are tailored to the specific conservation needs of the species, and are deemed necessary and advisable to provide for the conservation of the species. In such cases, some of the prohibitions and authorizations under 50 CFR 17.31 and 17.32 may be appropriate for the species and incorporated into the special rule under section 4(d) of the ESA, but the special rule will also include provisions tailored to the specific conservation needs of the listed species.

With this rule, the Service has found that a special rule under section 4(d) of the ESA that is tailored to the

conservation needs of the polar bear is necessary and advisable. The polar bear is a marine mammal and therefore is protected under the Marine Mammal Protection Act of 1972, as amended (MMPA) (16 U.S.C. 1361 et seq.). In addition, the polar bear is protected under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) (March 3, 1973; 27 U.S.T. 1087) as an Appendix-II species. We assessed the conservation needs of the species in light of the extensive protections already provided to the polar bear under the MMPA and CITES.

Under this rule, if an activity is authorized or exempted under the MMPA or CITES, we would not require any additional authorization under our regulations to conduct the activity. However, if the activity is not authorized or exempted under the MMPA or CITES and the activity would result in an act that would be otherwise prohibited under 50 CFR 17.31, the prohibitions of section 17.31 apply and we would require authorization under 50 CFR 17.32 of our regulations. In addition, otherwise lawful activities within the United States (except for Alaska) that cause incidental take of polar bears are exempt from the provisions of section 17.31.

### Subsistence Handicraft Trade and Cultural Exchanges

Section 10(e) of the ESA provides an exemption for Alaska Natives for the taking and importation of listed species if such taking is primarily for subsistence purposes. Nonedible by-products of species taken in accordance with the exemption, when made into authentic native articles of handicraft and clothing, may be transported, exchanged, or sold in interstate commerce. The ESA defines authentic native articles of handicraft and clothing as items composed wholly or in some significant respect of natural materials, and which are produced, decorated or fashioned in the exercise of traditional native handicrafts without the use of pantographs, multiple carvers, or other mass copying devices (16 U.S.C. 1539(e)(3)(ii)). That definition also provides that traditional native handicrafts include, but are not limited to, weaving, carving, stitching, sewing, lacing, beading, drawing, and painting. Authentic native articles of handicrafts and clothing are further defined at 50 CFR 17.3. This exemption is similar to one in section 101(b) of the MMPA, which provides an exemption from the moratorium on take for subsistence harvest and the creation and sale of authentic native articles of handicrafts

or clothing by Alaska Natives. The definition of authentic native articles of handicrafts and clothing in the MMPA is identical to the ESA definition, and our MMPA definition in our regulations at 50 CFR 18.3 is identical to the ESA definition at 50 CFR 17.3. Both statutes require that the taking may not be accomplished in a wasteful manner.

Under this special rule under section 4(d) of the ESA, any exempt activities under the MMPA associated with handicrafts or clothing or cultural exchange using subsistence-taken polar bears will not require additional authorization under the ESA. The limited, noncommercial import and export of authentic native articles of handicrafts and clothing that are created from polar bears taken by Alaska Natives will also continue. Under this rule, all such imports and exports involving polar bears will need to conform to what is currently allowed under the MMPA, comply with our import and export regulations found at 50 CFR part 14, and be noncommercial in nature. Service regulations at 50 CFR 14.4 define commercial as related to the offering for sale or resale, purchase, trade, barter, or the actual or intended transfer in the pursuit of gain or profit, of any item of wildlife and includes the use of any wildlife article as an exhibit for the purpose of soliciting sales, without regard to the quantity or weight. There is a presumption that eight or more similar unused items are for commercial use. The Service or the importer, exporter, or owner may rebut this presumption based upon the particular facts and circumstances of each case (see 50 CFR 14.4). Another activity covered by the special rule is cultural exchange between Alaska Natives and Native inhabitants of Russia, Canada, and Greenland with whom Alaska Natives share a common heritage. The MMPA allows the import and export of marine mammal parts and products that are components of a cultural exchange, which is defined under the MMPA as the sharing or exchange of ideas, information, gifts, clothing, or handicrafts. Cultural exchange has been an important exemption for Alaska Natives under the MMPA, and this special rule ensures that such exchanges will not be interrupted.

This rule also adopts the registered agent and tannery process from the current MMPA regulations. In order to assist Alaska Natives in the creation of authentic native articles of handicrafts and clothing, the Service's MMPA implementing regulations at 50 CFR 18.23(b) and (d) allow persons who are not Alaska Natives to register as an

agent or tannery. Once registered, agents are authorized to receive or acquire marine mammal parts or products from Alaskan Natives or other registered agents. They are also authorized to transfer (not sell) hides to registered tanners for further processing. A registered tannery may receive untanned hides from Alaska Natives or registered agents for tanning and return. The tanned skins may then be made into authentic articles of clothing or handicrafts. Registered agents and tanneries must maintain strict inventory control and accounting methods for any marine mammal part, including skins; they provide accountings of such activities and inventories to the Service. These restrictions and requirements for agents and tanners allow the Service to monitor the processing of such items while ensuring that Alaska Natives can exercise their rights under the exemption. Adopting the registered agent and tannery process aligns ESA provisions relating to the creation of handicrafts and clothing by Alaska Natives with the current process under the MMPA.

The provisions in this special rule under section 4(d) of the ESA regarding creation, shipment, and sale of authentic native articles of handicrafts and clothing apply only to items to which the subsistence harvest exemption applies under the MMPA. The exemption for Alaska Natives in section 10(e)(1) of the ESA applies to "any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska" and also applies to "any non-native permanent resident of an Alaskan native village." However, the Alaska Native exemption under section 101 of the MMPA is limited to only an "Indian, Aleut, or Eskimo who resides in Alaska and who dwells on the coast of the North Pacific Ocean or the Arctic Ocean." Because the MMPA is more restrictive, only a person who qualifies under the MMPA Alaska Native exemption may legally take polar bears for subsistence purposes, as a take by non-native permanent residents of Alaska native villages under the broader ESA exemption is not allowed under the MMPA. Therefore, all persons, including those who qualify under the Alaska Native exemption of the ESA, should consult the MMPA and our regulations at 50 CFR part 18 before engaging in any activity that may result in a prohibited act to ensure that their activities will be consistent with both laws.

*Import, Export, Take, Transport, Purchase, and Sale or Offer for Sale or Purchase*

The Service has generally adopted restrictions for threatened species on their import; export; take within the United States, the territorial seas of the United States, or upon the high seas; transport in interstate or foreign commerce in the course of a commercial activity; sale or offer for sale in interstate or foreign commerce; and possession, sale, delivery, carrying, transportation, or shipping of unlawfully taken species, either through a special rule or through the provisions of 50 CFR 17.31. For the polar bear, these same activities are already strictly regulated under the MMPA. Section 101 of the MMPA provides a moratorium on the taking and importation of marine mammals and their products. Section 102 of the MMPA further prohibits activities unless exempted or authorized under subsequent sections. Prohibitions in section 102(a) include take of any marine mammal on the high seas; take of any marine mammal in waters or on lands under the jurisdiction of the United States; use of any port, harbor, or other place under the jurisdiction of the United States to take or import a marine mammal; possession of any marine mammal or product taken in violation of the MMPA; and transport, purchase, sale, export, or offer to purchase, sell, or export any marine mammal or product taken in violation of the MMPA or for any purpose other than public display, scientific research, or enhancing the survival of the species or stock. Under sections 102(b) and (c) of the MMPA, it is unlawful to import a pregnant or nursing marine mammal; an individual taken from a species or population stock designated as depleted under the MMPA; an individual taken in a manner deemed inhumane; any marine mammal taken in violation of the MMPA or in violation of the law of another country; or any marine mammal product if it was made from any marine mammal taken in violation of the MMPA or in violation of the law of another country, or if it was illegal to sell in the country of origin. The MMPA then provides specific exceptions to these prohibitions under which certain acts are allowed only if all statutory requirements are met.

Section 104 of the MMPA provides for authorization of activities for public display (section 104(c)(2)), scientific research (section 104(c)(3)), enhancing the survival or recovery of a species (section 104(c)(4)), and photography (where there is level B harassment only; section 104(c)(6)). In addition, section

104(c)(8) specifically addresses the possession, sale, purchase, transport, export, or offer for sale of the progeny of any marine mammal taken or imported under section 104, and section 104(c)(9) sets strict standards for the export of any marine mammal from the United States. In all of these sections of the MMPA, strict criteria have been established to ensure that the impact of an authorized activity, if a permit were to be issued, would successfully meet Congress's finding in the MMPA that species "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." The statutory provisions of the MMPA allow fewer types of activities than does the ESA for threatened species, and the MMPA's standards are generally stricter for those activities than standards for comparable activities under the ESA. Because for polar bears, an applicant must obtain authorization under the MMPA to engage in an act that would otherwise be prohibited, and because both the types of activities and standards for those activities are generally stricter than the general standards under 50 CFR 17.32, this rule adopts the MMPA provisions as appropriate conservation protections under the ESA. All authorizations issued under section 104 of the MMPA will still be required to undergo consultation under section 7 of the ESA.

*Convention on International Trade in Endangered Species of Wild Fauna and Flora (Convention or CITES)*

Polar bears are also listed under Appendix II of CITES. CITES regulates the import and export of listed specimens, which include live and dead animals and plants, as well as parts and items made from the species. CITES and U.S. regulations that implement CITES at 50 CFR part 23 require the United States to regulate and monitor the trade in legally possessed CITES specimens over an international border. Thus, for example, CITES would apply to tourists driving from Alaska through Canada with polar bear handicrafts to a destination elsewhere in the United States. Appendix-II specimens may not be exported from a member country without the prior issuance of an export permit that requires findings that the export is not detrimental to the survival of the species and that the specimen was legally acquired. Some limited exceptions to this permit requirement exist. For example, member countries may exempt personal and household effects made of dead specimens from the permitting requirements. Personal and household effects must be personally owned for noncommercial purposes, and the quantity must be necessary or appropriate for the nature of the trip or stay or for household use. Persons who may cross an international border with a polar bear specimen should check with the Service and the country of transit or destination in advance as to applicable requirements. Because for polar bears, any person importing or exporting any live or dead animal, part, or product into or from the United States must comply with the strict provisions of CITES as well as the strict import and export provisions under the MMPA, this special rule adopts these requirements under CITES as appropriate conservation protections under the ESA.

*Import of Sport-Hunted Trophies and Other Specimens that are Non-Commercial*

The MMPA was amended in 1994 to allow for the import into the United States of certain sport-hunted polar bear trophies legally taken by the importer in Canada. Prior to issuing a permit for import of such trophies, the Service must find that Canada has a monitored and enforced sport-hunting program consistent with the purposes of the five-nation 1973 Agreement on the Conservation of Polar Bears, and that the program is based on scientifically sound quotas ensuring the maintenance of the population at a sustainable level. Currently, six populations are approved for import of polar bear trophies (see 62 FR 7302, 64 FR 1529, 66 FR 50843, and 50 CFR 18.30(i)).

Section 9(c)(2) of the ESA sets out an exemption to the general import prohibition for threatened, Appendix-II wildlife, both live and dead, when: (1) the taking and export meet all provisions of CITES; (2) all other import and reporting requirements under section 9 of the ESA are met; and (3) the import is not made in the course of a commercial activity. Since the polar bear is currently listed in Appendix II of CITES, this ESA exemption is generally applicable.

Because a sport-hunted trophy is not a specimen obtained or imported in the course of a commercial activity, the section 9(c)(2) ESA exemption would typically apply to the import of sport-hunted trophies, provided that all other requirements of section 9(c)(2) of the ESA are met. However, certain importers-persons importing sport-hunted trophy polar bears that were taken in Canada-will not be able to use this exemption. Under the MMPA, marine mammals such as the polar bear are "depleted" species as of the effective date of their listing as threatened or endangered species under the ESA (see section 3(1)(C) of the MMPA). As explained below under "Need for Interim Final Rule," the Court has ordered the Service to make the polar bear listing effective upon publication. Therefore, as of today's publication of the final rule listing the polar bear as a threatened species, the polar bear is also a depleted species under the MMPA. Sections 101(a)(3)(B) and 102(b) of the MMPA limit the activities that may be authorized for depleted species. For a depleted species, imports can be authorized under the MMPA only if the import qualifies as enhancement of the survival or recovery of the species or scientific research. Section 101(a)(3)(B) in particular makes clear that the importation of a specimen from a depleted species is prohibited unless it qualifies as one of the excepted activities: scientific research, photography for educational purposes, or enhancing the survival or recovery of the species. Importation of polar bear parts taken in sport hunts in Canada is not one of the exceptions to the restrictions on depleted species. Therefore, as of today's listing of the polar bear as a threatened species under the ESA, which appears elsewhere in today's **Federal Register**, importation of a sport-hunted polar bear trophy from Canada is prohibited even if previously authorized and authorization for the import of sport-hunted polar bear trophies from Canada is no longer available under section 104(c)(5) of the MMPA. Further, the import of sport hunted polar bear trophies from other countries has never been authorized under the MMPA. Section 17 of the ESA states that, unless expressly provided for, no provision in the ESA takes precedence over any more restrictive conflicting provision in the MMPA. Therefore, the ESA exemption under section 9(c)(2) is not available for the import of sport-hunted polar bears from Canada, and nothing in a special rule under section 4(d) of the ESA can override the more restrictive provisions of the MMPA.

*Public Display*

With the ESA listing and the concurrent designation of polar bears as a depleted species under the MMPA, the take and import of polar bears for public display are also affected. Section 104(c)(2) of the MMPA allows permits to be issued for the take and import of marine mammals for the purpose of public display provided facilities meet specific requirements. Before the listing under the ESA, a polar bear (or its progeny) that was permitted for the

purpose of public display could be transferred, transported, exported, or re-imported without additional MMPA authorization, provided the receiving institution meets the specific housing and display criteria or comparable standards (if an export was involved). However, once a species is designated as depleted, take and import of a marine mammal can no longer be authorized for the purpose of public display. As explained above, under sections 101(a)(3)(B) and 102(b) of the MMPA, take and imports can only be authorized for depleted species if the take or import meets the requirements of enhancement of the survival or recovery of the species or for scientific research. Polar bears or their progeny that qualify as public display animals prior to the ESA listing can continue to be displayed and transferred within the United States consistent with the MMPA requirements for notification outlined in section 104(c)(2)(E). Further, such animals, or their progeny, can be exported provided they meet the requirements for comparable standards under section 104(c)(9) of the MMPA and all requirements under CITES. However, any animals that have been exported cannot be re-imported for the purpose of public display, and no permit may be issued for the taking or importation of a polar bear for purposes of public display as of today's listing of the polar bear as a threatened species under the ESA, which appears elsewhere in today's **Federal Register**. As explained in the discussion on importation of sport-hunted trophies from Canada, nothing in a special rule under section 4(d) of the ESA can override these more restrictive provisions of the MMPA.

*Take for Self-Defense or Welfare of the Animal*

Both the MMPA and the ESA provide restrictions on the intentional take of protected species. However, both statutes provide exceptions when the take is either exempted or can be authorized for self-defense, the welfare of the animal, or removal or deterrence of a marine mammal from fishing gear. Many of these exemptions are provided by statute, and do not require authorization from the Service. Because the MMPA provides the appropriate management measures for a species such as the polar bear, this rule adopts those measures as appropriate management measures under the ESA.

**Take in Defense of Life or Property**

In the interest of public safety, both the MMPA and the ESA include provisions to allow for take, including lethal take, when this take is necessary

for self-defense or to protect another person. Section 101(c) of the MMPA states that it shall not be a violation to take a marine mammal if such taking is necessary for self-defense or to save the life of another person who is in immediate danger. Any such incident must be reported to the Service within 48 hours of occurrence. Section 11(a)(3) of the ESA similarly provides that no civil penalty shall be imposed if it can be shown by a preponderance of the evidence that the defendant committed an act based on a good faith belief that he or she was protecting himself or herself, a member of his or her family, or any other individual from bodily harm. Section 11(b)(3) of the ESA provides that it shall be a defense to prosecution if the defendant committed an offense based on a good faith belief that he or she was protecting himself or herself, a member of his or her family, or any other individual from bodily harm. The ESA regulations in 50 CFR 17.21(c)(2), which reiterate that any person may take listed wildlife in defense of life, clarify this exemption. Reporting of the incident is required under 50 CFR 17.21(c)(4).

Section 101(a)(4)(A) of the MMPA provides that a marine mammal may be deterred from damaging fishing gear or catch (by the owner or an agent or employee of the owner of that gear or catch), other private property (by the owner or an agent or employee of the owner of that property), and, if done by a government employee, public property so long as the deterrence measures do not result in death or serious injury of the marine mammal. This section also allows for any person to deter a marine mammal from endangering personal safety. Section 101(a)(4)(D) clarifies that this authority to deter marine mammals applies to stocks designated as depleted, which would include the polar bear. The non-lethal deterrence of a polar bear from fishing gear or other property, or for the purpose of personal safety, would not result in injury to the bear or removal of the bear from the population and could, instead, prevent serious injury or death to the bear by preventing escalation of an incident to the point where the bear is killed in self-defense.

**Take for the Welfare of the Animal**

The MMPA contains a number of provisions that allow taking of a marine mammal when that taking is for the health or welfare of the animal. Section 101(d) of the MMPA provides that it is not a violation of the MMPA for any person to take a marine mammal if the taking is necessary to avoid serious injury, additional injury, or death to a marine mammal entangled in fishing

gear or debris, and care is taken to prevent further injury and ensure safe release. The incident must be reported to the Service within 48 hours of occurrence. In addition, if entangled, the safe release of a marine mammal from fishing gear or other debris could prevent further injury or death of the animal. Therefore, by adopting this provision of the MMPA, this special rule provides for the conservation of polar bears in the event of entanglement with fishing gear and could prevent further injury or death of the bear.

Section 109(h) of the MMPA authorizes the humane taking of a marine mammal by specific categories of people (i.e., Federal, State, or local government officials or employees or a person designated under section 112(c) of the MMPA) in the course of their official duties provided that one of three criteria is met-the taking is for: (1) the protection or welfare of the mammal; (2) the protection of the public health and welfare; or (3) the non-lethal removal of nuisance animals. The MMPA regulations at 50 CFR 18.22 provide the specific requirements of the exception. The ESA regulations at 50 CFR 17.21(c)(3) are similar in that they authorize any employee or agent of the Service, any other Federal land management agency, the National Marine Fisheries Service, or a State conservation agency, who is designated by the agency for such purposes, to take listed wildlife when acting in the course of official duties if the action is necessary to: (i) aid a sick, injured, or orphaned specimen; (ii) dispose of a dead specimen; (iii) salvage a dead specimen for scientific study; or (iv) remove a specimen that may constitute a threat to human safety, provided that the taking is humane or, if lethal take or injury is necessary, that there is no other reasonable possibility to eliminate the threat. Further, 50 CFR 17.31(b) allows any employee or agent of the Service, of the National Marine Fisheries Service (NMFS), or of a State conservation agency which is operating a conservation program under the terms of a Cooperative Agreement with the Service in accord with section 6 of the ESA, when acting in the course of official duty, to take those species of threatened wildlife which are covered by an approved cooperative agreement to carry out conservation programs. These authorizations under the ESA are comparable to those under the MMPA. Therefore, if authorization for take is provided under section 109(h) of the MMPA, we will not require any further authorization under the ESA.

**28310**    **Federal Register** / Vol. 73, No. 95 / Thursday, May 15, 2008 / Rules and Regulations

*Pre-Act Specimens*

The ESA, MMPA, and CITES all have provisions for the regulation of specimens, both live and dead, that were acquired or removed from the wild prior to application of the law or the listing of the species, but the laws treat these specimens somewhat differently. ESA section 9(b)(1) provides a broad exemption for threatened species held in a controlled environment as of the date of publication of the listing provided that the holding and any subsequent holding or use is not in the course of a commercial activity. Additionally, section 10(h) of the ESA provides an exemption for certain antique articles. All live polar bears held in captivity prior to today's rule listing the polar bear as a threatened species under the ESA, which appears elsewhere in today's **Federal Register**, and not used or subsequently held or used in the course of a commercial activity, and all items containing polar bear parts that qualify as antiques under the ESA, would qualify for this exemption.

Section 102(e) of the MMPA contains a pre-MMPA exemption that provides that the MMPA shall not apply to any marine mammal or marine mammal product taken prior to December 21, 1972. In addition, Article VII(2) of CITES provides a pre-Convention exception that exempts a pre-Convention specimen from standard permitting requirements in Articles III, IV, and V of the Convention when the exporting or re-exporting country is satisfied that the specimen was acquired before the provisions of CITES applied to it and issues a CITES document to that effect (see 50 CFR 23.45). Under the CITES pre-Convention exception, these specimens still require documentation for any international movement that verifies that the specimen was acquired before CITES applied to the species, which for the polar bear was July 1, 1975. Pre-Convention certificates required by CITES and pre-MMPA affidavits and supporting documentation required under the Service's regulations at 50 CFR 18.14 ensure that trade in pre-MMPA and pre-Convention specimens meet the requirements of the exemptions.

The MMPA has been in force since 1972 and CITES since mid-1975. In that time, there has never been a conservation problem identified related to pre-Act polar bear specimens. Thus, CITES and the MMPA provide appropriate protections for the polar bear in this regard, and additional restrictions under the ESA are not necessary.

*Incidental Take of Polar Bears During the Course of Authorized Specific Activities (other than Commercial Fishing)*

The take restrictions under the MMPA and those typically provided for threatened species under 50 CFR 17.31 or a special rule under section 4(d) of the ESA also apply to incidental take. This special rule under section 4(d) of the ESA aligns ESA incidental take provisions for polar bears with incidental take provisions of the MMPA and its implementing regulations.

Section 7(a)(2) of the ESA requires Federal agencies to ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency (action agency) must enter into consultation with the Service.

Further, regulations at 50 CFR 402.16 require Federal agencies to reinitiate consultation on previously reviewed actions in instances where we have listed a new species or subsequently designated critical habitat that may be affected and the Federal agency has retained discretionary involvement or control over the action (or the agency's discretionary involvement or control is authorized by law). These requirements under the ESA remain unchanged, and this special rule does not negate the need for a Federal action agency to consult with the Service to ensure that any action being authorized, funded, or carried out is not likely to jeopardize the continued existence of any endangered or threatened species, including the polar bear.

As a result of consultation, we document compliance with the requirements of section 7(a)(2) of the ESA through our issuance of a concurrence letter for Federal actions that may affect, but are not likely to adversely affect, listed species or critical habitat, or issuance of a biological opinion for Federal actions that may affect listed species or critical habitat. In those cases where the Service determines an action that is likely to adversely affect will not result in jeopardy or adverse modification of critical habitat but may result in incidental take, the biological opinion will provide: a statement that specifies the amount or extent of such take; any reasonable and prudent measures considered appropriate to minimize such effects; terms and conditions to implement the measures necessary to

minimize effects; and procedures for handling actual incidental take. Under section 7(b)(4) of the ESA, an incidental take statement for a marine mammal such as the polar bear cannot be issued until the applicant has received incidental take authorization under the MMPA.

50 CFR 17.32(b) provides a mechanism for non-Federal parties to obtain authorization for the incidental take of threatened wildlife. This process requires that an applicant specify effects to the species and steps to minimize and mitigate such effects. If the Service determines that the mitigation measures will minimize effects of any potential incidental take and that take will not appreciably reduce the likelihood of survival and recovery of the species, we may grant incidental take authorization. This authorization would include terms and conditions deemed necessary or appropriate to insure minimization of take, as well as monitoring and reporting requirements.

Under this special rule, if incidental take has been authorized under section 101(a)(5) of the MMPA, either by the issuance of an Incidental Harassment Authorization (IHA) or through incidental take regulations, we will not require an incidental take permit issued in accordance with 50 CFR 17.32(b).

Section 101(a)(5) of the MMPA gives the Service the authority to allow the incidental, but not intentional, taking of small numbers of marine mammals, in response to requests by U.S. citizens (as defined in 50 CFR 18.27(c)) engaged in a specified activity (other than commercial fishing) in a specified geographic region. Incidental take cannot be authorized unless the Service finds that the total of such taking will have no more than a negligible impact on the species and, for Alaska species, will not have an unmitigable adverse impact on the availability of the species for taking for subsistence use by Alaska Natives.

If any take that is likely to occur will be limited to non-lethal harassment of the species, the Service may issue an Incidental Harassment Authorization (IHA) under section 101(a)(5)(D) of the MMPA. IHAs cannot be issued for a period longer than one year. If the taking may result in more than harassment, regulations under section 101(a)(5)(A) of the MMPA must be issued, which may be in place for no longer than 5 years. Once regulations making the required findings are in place, we issue Letters of Authorization (LOAs) that authorize the incidental take consistent with the provisions in the regulations. In either case, the IHA or the regulations must set forth: (1)

permissible methods of taking; (2) means of effecting the least practicable adverse impact on the species and their habitat and on the availability of the species for subsistence uses; and (3) requirements for monitoring and reporting.

These incidental take standards under the MMPA currently provide a greater level of protection for the polar bear than adoption of the standards under 50 CFR 17.32. Negligible impact, as defined at 50 CFR 18.27(c), is an impact that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species through effects on annual rates of recruitment or survival. This is a more protective standard than 50 CFR 17.32's requirement to minimize and mitigate, to the maximum extent practicable, the impact of any takings. In addition, the authorizations under the MMPA are limited to one year for IHAs and 5 years for regulations, thus ensuring that activities that are likely to cause incidental take are periodically reviewed and incidental measures that ensure that take remains at the negligible level can be updated. Therefore, this special rule adopts the MMPA standards for authorizing non-Federal incidental take. As noted earlier, requirements to authorize incidental take associated with a Federal action are set under section 7 of the ESA and would not be affected by this special rule.

In the consideration of IHAs or the development of incidental take regulations, the Service will conduct an intra-Service consultation under section 7(a)(2) of the ESA to ensure that providing an MMPA incidental take authorization is not likely to jeopardize the continued existence of the polar bear. Since the standard for approval of an IHA or the development of incidental take regulations under the MMPA is no more than "negligible impact" to the affected marine mammal species, we believe that any MMPA-compliant authorization or regulation would meet the ESA section 7(a)(2) standards of avoiding jeopardy to the species and destruction or adverse modification of critical habitat (if any were to be designated for the polar bear).

Further, to the extent that any Federal actions comport with the standards for MMPA incidental take authorization, we would fully anticipate any such section 7 consultation under the ESA would result in a finding that the proposed action is not likely to jeopardize the continued existence of the polar bear. In addition, we anticipate that any such proposed action(s) would augment protection and enhance agency management of the

polar bear through the application of site-specific mitigation measures contained in authorization issued under the MMPA. Therefore, we do not anticipate that any entity holding incidental take authorization under the MMPA and in compliance with all mitigation measures under that authorization would be required to implement further measures under the ESA section 7 process.

An example of application of the MMPA incidental take standards to the polar bear is associated with onshore and offshore oil and gas exploration, development, and production activities in Alaska. Since 1991, affiliates of the oil and gas industry have requested, and we have issued regulations for, incidental take authorization for activities in areas of polar bear habitat. This includes regulations issued for incidental take in the Chukchi Sea for the period 1991–1996, and regulations issued for incidental take in the Beaufort Sea from 1993 to the present. A detailed history of our past regulations for the Beaufort Sea region can be found in our final regulation published on November 28, 2003 (68 FR 66744) and August 2, 2006 (71 FR 43926). On June 1, 2007, the Service published a proposed rule and request for comments on regulations for similar activities and potential incidental take in the Chukchi Sea (72 FR 30670).

The mitigation measures that we have required for all oil and gas projects include a site-specific plan of operation and a site-specific polar bear interaction plan. Site-specific plans outline the steps the applicant will take to minimize effects on polar bears, such as garbage disposal and snow management procedures to reduce the attraction of polar bears, an outlined chain-of-command for responding to any polar bear sighting, and polar bear awareness training for employees. The training program is designed to educate field personnel about the dangers of bear encounters and to implement safety procedures in the event of a bear sighting. Most often, the appropriate response involves merely monitoring the animal's activities until they move out of the area. However, personnel may be instructed to leave an area where bears are seen. If it is not possible to leave, the bears can be displaced by using forms of deterrents, such as vehicles, vehicle horn, vehicle siren, vehicle lights, spot lights, or, if necessary, pyrotechnics (e.g., cracker shells). The intent of the interaction plan and training activities is to allow for the early detection and appropriate response to polar bears that may be encountered during operations, which

eliminates the potential for injury or lethal take of bears in defense of human life. By requiring such steps be taken, we ensure any impacts to polar bears will be minimized and will remain negligible.

Additional mitigation measures are also required on a case-by-case basis depending on the location, timing, and specific activity. For example, we may require trained marine mammal observers for offshore activities; pre-activity surveys (e.g., aerial surveys, infra-red thermal aerial surveys, or polar bear scent-trained dogs) to determine the presence or absence of dens or denning activity; measures to protect pregnant polar bears during denning activities (den selection, birthing, and maturation of cubs), including incorporation of a 1-mile (1.6-kilometer) buffer surrounding known dens; and enhanced monitoring or flight restrictions. These mitigation measures are implemented to limit human-bear interactions and disturbances to bears and have ensured that industry effects on polar bears have remained at the negligible level.

Data provided by monitoring and reporting programs in the Beaufort Sea and in the Chukchi Sea, as required under the incidental take authorizations for oil and gas activities, have shown that the mitigation measures have successfully minimized effects on polar bears. For example, since 1991, when the incidental take regulations became effective in the Chukchi and Beaufort Seas, there has been no known instance of a polar bear being killed or of personnel being injured by a bear as a result of oil and gas industry activities. The mitigation measures associated with the Beaufort Sea incidental take regulations, which, based on the monitoring and reporting data, have proven to minimize human-bear interactions, will be part of the Chukchi Sea incidental take regulations currently under review.

*Polar Bears Taken Incidentally in the Course of Commercial Fishing Operations*

Incidental take of marine mammals as a result of commercial fishery operations is regulated separately under the MMPA under section 118, which is under the authority of the Secretary of Commerce. The regulations that outline the requirements for commercial fisheries that may incidentally take marine mammals can be found at 50 CFR part 229. These regulations outline the process and requirements for placing all commercial fisheries in one of three categories, which are based on the relative frequency of incidental

serious injuries and mortalities of marine mammals in each fishery. Category I designates fisheries with frequent serious injuries and mortalities incidental to commercial fishing; Category II designates fisheries with occasional serious injuries and mortalities; and Category III designates fisheries with a remote likelihood of no known serious injuries or mortalities. If a marine mammal is listed as endangered or threatened, section 118 of the MMPA further specifies that the Secretary of Commerce shall develop and implement a take reduction plan to assist in the restoration or to prevent the depletion of a strategic marine mammal stock that interacts with a commercial fishery that has a high level of mortality and serious injury.

In addition, for depleted species such as the polar bear, section 101(a)(5)(E) of the MMPA provides that the Secretary may allow incidental take caused by commercial fishing, only if the finding has been made that any incidental mortality and serious injury will have no more than a negligible impact on the species; a recovery plan has been developed or is being developed under the ESA; and where required under section 118 of the MMPA, a monitoring program is established, vessels engaged in such fisheries are registered, and a take reduction plan has been developed or is being developed for the species. Upon making a determination that these requirements have been met, the National Marine Fisheries Service (NMFS) issues the appropriate permits for registered vessels. If during the course of the commercial fishing season, it is determined that the level of incidental mortality or serious injury has or is likely to result in more than negligible impact, the permit may be modified as necessary.

With this special rule, if incidental take of polar bears by commercial fisheries is authorized under sections 118 and 101(a)(5)(E) of the MMPA, we will not require any additional authorizations. At present, polar bear stocks in Alaska have no direct interaction with commercial fisheries activities, and we know of no instances where a take is likely to occur. We also anticipate, therefore, that a consultation on commercial fishery activities in Alaska would result in a "no effect" determination under section 7 of the ESA. As stated above, this rule does not negate the need for ESA consultation with the Service if these actions may affect a listed species, including the polar bear.

*Military Activities*

The take restrictions under the MMPA and the ESA apply to military activities that may affect marine mammals. However, the National Defense Authorization Act (NDAA) of 2004 provided an exemption under the MMPA and a limitation under the ESA to be invoked in certain situations.

Section 318 of the NDAA established a limitation on the designation of critical habitat under section 4(a)(3) of the ESA. Section 318 states that "[T]he Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 101 of the Sikes Act (16 U.S.C. 670a), if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation." However, section 318 of the NDAA further states that this limitation does not affect the requirement for the Department of Defense (DOD) to consult under section 7(a)(2) of the ESA nor the obligation of the DOD to comply with section 9 of the ESA. This limitation will apply to any designation of critical habitat for the polar bear as long as an integrated natural resources management plan (INRMP) is in place as described. However, as clarified in section 318 of the NDAA, the DOD will be required to consult with the Service under section 7(a)(2) of the ESA if any proposed action may affect the polar bear. This special rule does not change that requirement.

Section 319 of the NDAA revised the definition of harassment under section 3(18) of the MMPA as it applies to military readiness or scientific research conducted by or on behalf of the Federal government. Section 319 defined harassment for these purposes as "(i) any act that injures or has the significant potential to injure a marine mammal or marine mammal stock in the wild; or (ii) any act that disturbs or is likely to disturb a marine mammal or marine mammal stock in the wild by causing disruption of natural behavioral patterns, including, but not limited to, migration, surfacing, nursing, breeding, feeding, or sheltering, to a point where such behavioral patterns are abandoned or significantly altered." Section 319 further amended section 101 of the MMPA to provide a mechanism for the DOD to exempt any actions or a category of actions necessary for national defense from requirements of the MMPA provided that DOD has conferred with the Secretaries of Commerce and the

Interior. Such an exemption may be issued for no more than 2 years. A similar exemption is not provided for the DOD under the ESA.

*Consultation under Section 7 of the ESA*

For species listed as threatened or for designated critical habitat, section 7(a)(2) of the ESA requires Federal agencies to ensure that activities they authorize, fund, or carry out are not likely to jeopardize the continued existence of the species or to destroy or adversely modify its critical habitat. If a Federal action may affect a listed species or its critical habitat, the responsible Federal agency (action agency) must enter into consultation with us. In addition, as a Federal agency, the Service must conduct an intra-Service consultation for any action it authorizes, funds, or carries out. This requirement does not change with the adoption of this special rule.

Nonetheless, the determination of whether consultation is triggered is narrow; that is, the focus of the effects analysis is on the discrete effect of the proposed agency action. This is not to say that other factors affecting listed species are ignored. To the contrary, once in consultation, the status of the species, the baseline analysis and cumulative effects analysis all consider factors other than just the effects of the proposed action.

But in the simplest terms, a Federal agency evaluates whether consultation is necessary by analyzing what will happen to listed species or critical habitat "with and without" the proposed action. Typically, this analysis will review direct effects, indirect effects, and the effects that are caused by interrelated and interdependent activities to determine if the proposed action "may affect" listed species or critical habitat. For those effects beyond the footprint of the action, our regulations at 50 CFR 402.02 require that they both be "caused by the action under consultation" and "reasonably certain to occur." That is, effects are only appropriately considered in a section 7 analysis if there is a causal connection between the proposed action and a discernible effect to the species or critical habitat that is reasonably certain to occur. One must be able to "connect the dots" between the proposed action, an effect, and an impact to the species and there must be a reasonable certainty that the effect will occur.

While there is no case law directly on point, the 9th Circuit has ruled that in section 7 consultations the Services must demonstrate the connection between the action under consultation and the actual resulting take of the

listed species, which is one form of effect. *Arizona Cattlegrowers' Association* v. *U.S. Fish and Wildlife Service,* 273 F.3d 1229 (9th cir. 2001). In that case, the court reviewed grazing allotments and found several incidental take statements to be arbitrary and capricious because the Service did not connect the action under consultation (grazing) with an effect on (take of) specific individuals of the listed species. The court held that the Service had to demonstrate a causal link between the action under consultation (issuance of grazing permits with cattle actually grazing in certain areas) and the effect (take of listed fish in streams), which had to be reasonable certainty to occur. The court noted that "speculation" with regard to take "is not a sufficient rational connection to survive judicial review." *Arizona Cattlegrowers',* 273 F.3d at 1247.

We have specifically considered whether a Federal action that produces GHG emissions is a "may affect" action that requires section 7 consultation with regard to any and all species or critical habitat that may be impacted by climate change. As described above, the regulatory analysis of effects outside the footprint of the proposed action requires the determination of whether a causal linkage exists between the proposed action, the effect in question (climate change), and listed species or critical habitat. There must be a traceable connection from one to the next and the effect must be "sonably certain to occur." This causation linkage narrows section 7 consultation requirements to listed species and critical habitat in the "action area" rather than to all listed species or all designated critical habitats. Without the requirement of a causal connection between the action under consultation and effects to species, literally every agency action that contributes greenhouse gases to the atmosphere would arguably result in consultation with respect to every listed species or critical habitat that may be affected by climate change.

There is currently no way to determine how the emissions from a specific project under consultation both influence climate change and then subsequently affect specific listed species or critical habitat, including polar bears. As we now understand them, the best scientific data currently available does not draw a causal connection between GHG emissions resulting from a specific Federal action and effects on listed species or critical habitat by climate change, nor are there sufficient data to establish the required causal connection to the level of reasonable certainty between an action's resulting emissions and effect on species or critical habitat.

*Necessary and Advisable Finding*

This rulemaking revises our regulations at 50 CFR part 17 to include a special rule that, in most instances, would adopt the strict conservation provisions of the MMPA and CITES as the appropriate regulatory provisions for this threatened species. These provisions regulate subsistence handicraft trade and cultural exchanges; import, export, intentional take, transport, purchase, and sale or offer for sale or purchase; take for self-defense or welfare of the animal; pre-Act specimens; incidental take during the course of specific activities; and incidental take in the course of commercial fishing operations. In addition, we have also clarified operation of the ESA section 7 consultation process.

For the most part, the MMPA and its implementing regulations already provide more protective measures than would be provided for the polar bear under the general ESA regulations at 50 CFR sections 17.31 and 17.32. As discussed earlier, authorizations can only be issued for public display, scientific research, limited photography, and enhancement of the survival or recovery of the species, whereas under the general threatened species regulations, authorizations are available for a wider range of activities, including permits for any special purpose consistent with the ESA. In addition, for those activities that are available under both the MMPA and the general threatened species regulations, the MMPA issuance criteria are often more strict. For example, in order to obtain an enhancement permit under the MMPA, the Service must find that any taking or importation is likely to contribute significantly to maintaining distribution or numbers necessary to ensure the survival or recovery of the species or stock and is consistent with any conservation plan or ESA recovery plan for the species or stock or, if no conservation or ESA recovery plan is in place, with the Service's evaluation of actions required to enhance the survival or recovery of the species or stock in light of factors that would be addressed in a conservation plan or ESA recovery plan. Also as explained earlier, with the designation of the polar bear as a depleted species under the MMPA, no permit may be issued for the taking or importation for the purpose of public display whereas section 17.32 would allow issuance of a permit for zoological exhibition or educational purposes.

In addition to the restrictions on import and export discussed above under the MMPA, CITES provisions that apply to the polar bear also ensure that import into or export from the United States is carefully regulated. As an Appendix-II species, the export of any polar bear, either live or dead, and any polar bear parts or products would require an export document where it has been determined that the specimen was legally acquired under international and domestic laws. Prior to export, the exporting country must also find that export will not be detrimental to the survival of the species. A valid export document issued by the exporting country must be presented to the officials of the importing country before the polar bear specimen will be cleared for importation.

As discussed earlier, incidental take authorizations under existing provisions of the MMPA are also stricter than similar provisions would be under the general ESA regulations at 50 CFR 17.32. The general ESA regulations require that an applicant will, to the maximum extent practicable, minimize and mitigate the impacts of the takings; the applicant will ensure adequate funding for the conservation plan and procedures to deal with unforeseen circumstances will be provided; and the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild. In comparison, for any incidental take of a depleted species such as the polar bear (whether caused by commercial fishing or any other specified activity), the MMPA sets the stricter standard that authorization cannot be issued unless the Service finds that the taking will have no more than a negligible impact on the species. This strict standard, and the mitigation measures that have been imposed to ensure that any incidental take remains at the negligible level, have contributed to the Service's finding in the final listing rule that activities for which incidental take of polar bears has been authorized to date are not a threat to the species throughout all or a significant portion of its range.

In addition, a few provisions between the MMPA and the general threatened species regulations at 50 CFR 17.31 and 17.32 are essentially comparable. Both provisions provide an exemption for intentional take when the take is necessary for self-defense or to save the life of another person. Both laws also contain provisions that allow intentional take when that taking is for the protection or welfare of the animal or removal of an animal is necessary for the public health or welfare. As discussed earlier, the MMPA also

contains provisions that allow for the non-lethal deterrence of actions that will prevent damage of personal or private property.

In many ways, adoption of the existing provisions in the MMPA would not result in significant differences from provisions that would apply under section 11 of the ESA and 50 CFR sections 17.31 and 17.32. Also, the MMPA exceptions are available only in limited circumstances and some require authorization by the Service, in which case the agency includes terms and conditions that provide for the protection of the animal. None of the activities to which these exceptions would apply were identified in the final ESA listing rule as threatening the polar bear throughout all or a significant portion of its range.

In fact, these provisions under the MMPA have often proven to be beneficial to the conservation of marine mammals such as the polar bear. Section 112(c) of the MMPA allows the Service to enter into cooperative agreements with other Federal or State agencies and public or private institutions or other persons to carry out the purposes of section 109(h) of the MMPA. The ability to designate non-Federal, non-State "cooperators" under section 112(c) of the MMPA has allowed the Service to work with private groups to retrieve carcasses, respond to injured animals, and provide care and maintenance for stranded or orphaned animals. This has provided benefits by drawing on the expertise and allowing the use of facilities of non-Federal and non-State scientists, aquaria, veterinarians, and other private entities.

In the interest of public safety and to protect polar bears, the Service also provides authorization for specified individuals to deter polar bears on an as-needed basis under the authorities of the MMPA. The purpose of the authorization is to allow intentional take of polar bears by harassment to haze animals for the protection of both human life and polar bears. These measures have proven to be successful in preventing injury and death to both people and polar bears. Only individuals who are trained and qualified in proper techniques for hazing polar bears may receive such an authorization. All polar bear hazing events must be reported to the Service within 24 hours of the event and all encounters must be documented. These reports have substantiated the benefits of hazing in these situations and shown that this practice does not pose a threat to the polar bear.

The non-lethal deterrence of a marine mammal from fishing gear or other property or for the purpose of personal safety is also limited to actions that will not result in death or serious injury of the animal and may in fact prevent serious injury or death of the animal from an escalating situation. In addition, the entanglement provisions allow for the safe release of a marine mammal from fishing gear or other debris and are designed to prevent further injury or death of the animal.

A few provisions of the MMPA or CITES are less strict than the ESA regulations that are generally applied to threatened species under 50 CFR 17.31 and 17.32, but, for the reasons explained below, these provisions are still the appropriate regulatory mechanisms to apply to the polar bear. Both the ESA and the MMPA recognize the intrinsic role that marine mammals have played and continue to play in the subsistence, cultural, and economic lives of Alaska Natives. The Service, in turn, recognizes the important role that Alaska Natives play in the conservation of marine mammals. Amendments to the MMPA in 1994 acknowledged this role by authorizing the Service to enter into cooperative agreements with Alaska Natives for the conservation and co-management of subsistence use of marine mammals (section 119 of the MMPA). Through these cooperative agreements, the Service has worked with Alaska native organizations to better understand the status and trends of polar bear throughout Alaska. For example, Alaska Natives collect and contribute biological specimens from subsistence-harvested animals for biological analysis. Analysis of these samples allows us to monitor the health and status of polar bear stocks.

Further, as discussed in our proposed and final rules to list the polar bear as a threatened species (72 FR 1064; January 9, 2007 and today's **Federal Register**), the Service cooperates with the Alaska Nanuuq Commission, an Alaska Native organization that represents interests of Alaska Native villages whose members engage in the subsistence hunting of polar bears, to address polar bear subsistence harvest issues. In addition, for the Southern Beaufort Sea population, hunting is regulated voluntarily and effectively through an agreement between the Inuvialuit of Canada and the Inupiat of Alaska (implemented by the North Slope Borough) as well as being monitored by the Service's marking, tagging, and reporting program. In addition, in the Chukchi Sea, the Service will be working with Alaska Natives through the recently-concluded Agreement between the United States of America and the Russian Federation on the Conservation and Management of the Alaska-Chukotka Polar Bear Population (Bilateral Agreement), under which one of two commissioners representing the United States will represent the Native people of Alaska and, in particular, the Native people for whom polar bears are an integral part of their culture. Thus, we recognize the unique contributions Alaska Natives are able to provide to the Service's understanding of polar bears, and their interest in ensuring that polar bear stocks are conserved and managed to achieve and maintain healthy populations.

We are also mindful of the unique exemptions from the prohibitions against take, import, and interstate sale of authentic native handicrafts and clothing provided to Alaska Natives under the ESA. These exemptions are similar to the exemptions provided Alaska Natives under the MMPA. The Service recognizes the significant conservation benefits that Alaska Natives have already made to polar bears through the measures that they have voluntarily taken to self-regulate harvest that is otherwise exempt under the MMPA and the ESA and through their support of measures for regulation of harvest. This contribution has provided significant benefit to polar bears throughout Alaska, and will continue by maintaining and encouraging the involvement of the Alaska Native community in the conservation of the species. This special rule under section 4(d) of the ESA provides for the conservation of polar bears, while at the same time accommodating Alaska Natives' subsistence, cultural, and economic interests which are interests recognized by both the ESA and MMPA. Therefore, the Service finds that aligning provisions under the ESA relating to the creation, shipment, and sale of authentic native handicrafts and clothing by Alaska Natives with what is already allowed under the MMPA contributes to a regulation that is necessary and advisable to provide for the conservation of polar bears.

This aspect of the special rule is limited to activities that are not already exempted under the ESA. The ESA itself provides a statutory exemption to Alaska Natives for the harvesting of polar bears from the wild as long as the taking is for primarily subsistence purposes. The ESA then specifies that polar bears taken under this provision can be used to create handicrafts and clothing and that these items can be sold in interstate commerce. Thus, this rule does not regulate the taking or importation of polar bears or the sale in

interstate commerce of authentic native articles of handicrafts and clothing by qualifying Alaska Natives; these have already been exempted by statute. The rule addresses only activities relating to cultural exchange and limited types of travel, and to the creation and shipment of authentic native handicrafts and clothing that are currently allowed under section 101 of the MMPA that are not already clearly exempted under the ESA.

In addition, in our final rule to list the polar bear as threatened, while we found that polar bear mortality from harvest and negative bear-human interactions may be approaching unsustainable levels for some populations, especially those experiencing nutritional stress or declining population numbers as a consequence of habitat change, subsistence take by Alaska Natives does not currently threaten the polar bear throughout all or any significant portion of its range. Range-wide, continued harvest and increased mortality from bear-human encounters or other reasons are likely to become more significant threats in the future, particularly for declining or nutritionally-stressed populations. The Polar Bear Specialist Group (PBSG) (Aars et al. 2006, p. 57), through resolution, urged that a precautionary approach be instituted when setting harvest limits in a warming Arctic environment, and continued efforts are necessary to ensure that harvest or other forms of removal do not exceed sustainable levels. However, the Service has found that standards for subsistence harvest in the United States under the MMPA and the voluntary measures taken by Alaska Natives to manage subsistence harvest in the United States have been effective, and that, range-wide, the lawful subsistence harvest of polar bears and the associated creation, sale, and shipment of authentic handicrafts and clothing currently do not threaten the polar bear throughout all or a significant portion of its range.

This rule also adopts the pre-Act provisions of the MMPA. While under this special rule, polar bear specimens that were obtained prior to the date that the MMPA went into effect (December 21, 1972) are not subject to the same restrictions as other threatened species under the general regulations at sections 17.31 and 17.32, the number of specimens and the nature of the activities to which these restrictions would apply is limited. There are very few live polar bears, either in a controlled environment within the United States or elsewhere, that would be considered "pre-Act" under the MMPA. Therefore, all of the MMPA prohibitions would probably apply to all live polar bears. Of the dead specimens that would be considered "pre-Act" under the MMPA, very few of these specimens would likely be subject to commercial activities due to the age and probable poor physical quality of these specimens. Furthermore, under CITES these specimens would still require documentation for any international movement, which would verify that the specimen was acquired before CITES went into affect in 1976. While the general threatened species regulations would provide some additional restrictions if a commercial transaction were to take place, such transactions have not been identified as a threat in any way to the polar bear. The adoption of this special rule would thus provide appropriate protections for the species while eliminating unnecessary permitting burdens on the public.

Finally the military exemption under the MMPA, while not available under the general ESA regulations of 50 CFR 17.31 and 17.32, is limited to narrow circumstances; can only be invoked after the Secretary of Defense, after conferring with the Secretary of the Interior, has found that the action is necessary for national defense; and cannot remain in place for longer than two years. No actions by the U.S. Department of Defense were identified as a threat to the polar bear throughout all or a significant portion of its range in the final ESA listing rule.

We have determined that requiring additional authorization to carry out activities that are already strictly regulated under the MMPA and CITES would not increase protection for polar bears but would merely create an additional, unnecessary administrative burden on the public. Our 36-year history of implementation of the MMPA, 33-year history of implementation of CITES, and our analysis in the ESA listing rule, which shows that none of the activities currently regulated under these U.S. laws are factors that threaten the polar bear throughout all or a significant portion of its range, demonstrate that the MMPA and CITES provide appropriate regulatory protection to polar bears for activities that are regulated under these laws. In addition, the threat that has been identified in today's final rule that lists the polar bear as a threatened species—loss of habitat and related effects—would not be alleviated by the additional overlay of provisions in the general threatened species regulations at 50 CFR 17.31 and 17.32.

Therefore, this special rule under section 4(d) of the ESA adopts existing conservation regulatory requirements under the MMPA and CITES as the appropriate regulatory provisions for this threatened species. Under this rule, if an activity is authorized or exempted under the MMPA or CITES, no additional authorization will be required. But if an activity is not authorized or exempted under the MMPA or CITES and the activity would result in an act that would be otherwise prohibited under 50 CFR 17.31, the protections provided by the general threatened species regulations will apply. In such circumstances, the prohibitions of 50 CFR 17.31 would be in effect, and authorization under 50 CFR 17.32 would be required. In addition, any action authorized, funded, or carried out by the Service that may affect polar bears, including the Service's issuance of any permit or authorization described above, will require consultation under section 7 of the ESA to ensure that the action will not jeopardize the continued existence of the species. This provision provides an additional overlay of protection for the species. Further, ESA civil and criminal penalties will apply, including where a person has obtained authorization or qualifies for an exemption under the MMPA or CITES but has failed to comply with all terms and conditions of the authorization or exemption.

For the reasons discussed above, we find that this special rule under section 4(d) of the ESA is necessary and advisable to provide for the conservation of the polar bear.

### Need for Interim Final Rule

Under section 553(b) of the Administrative Procedure Act (APA), we have good cause to find that the delay associated with public comment on a proposed rule would be detrimental to the conservation of the polar bear and therefore is contrary to the public interest. If the Secretary went through the standard rule-making process (using the full public-notice-and-comment process prior to putting a final rule in place), it would result in the default provisions at 50 CFR 17.31 and 17.32 controlling polar bear management in the interim. That outcome would be contrary to the public interest in this case because immediate implementation of the interim special rule has the advantage of providing a conservation benefit to polar bears that is unavailable under the general threatened species provisions in sections 17.31 and 17.32. Under the interim special rule, the Service can

continue to authorize nonlethal measures to deter polar bears under appropriate situations and therefore avoid interactions with people. In the past these steps have proven successful in preventing injury and death to both people and polar bears. The general threatened species provisions in sections 17.31 and 17.32 would not allow such protection for either people or bears. In addition, as discussed in detail in the preamble, applying the default provisions under sections 17.31 and 17.32, unmodified by a special 4(d) rule, during the interim period would not provide any significant conservation benefit to the species.

In addition, we have good cause to waive the standard 30-day effective date for this special rule consistent with section 553(d)(3) of the APA. On April 28, 2008, the United States District Court for the Northern District of California ordered us to publish the final determination on whether the polar bear should be listed as an endangered or threatened species by May 15, 2008. As part of its order, the Court ordered us to waive the standard 30-day effective date for the final determination. That determination, that the polar bear qualifies as a threatened species under the ESA, is published in today's **Federal Register** and, consistent with the Court's order, is effective immediately. It would be extremely confusing to the public if the listing decision were immediately effective but the special rule that applies to the polar bear became effective 30 days later. In such a case, the provisions in sections 17.31 and 17.32 would apply for 30 days until the regulatory measures under this rule took effect. The public would have to adapt their activities to the requirements of sections 17.31 and 17.32, and then in 30 days would have to understand that new provisions now apply. To avoid confusion arising from varying effective dates, we are therefore waiving the effective date for this interim special rule so it is consistent with the Court's order on the listing determination.

**Public Comments Solicited**

We solicit comments or suggestions from the public, other concerned governmental agencies, the scientific community, industry, or any other interested party concerning this special rule under section 4(d) of the ESA for the polar bear.

You may submit your comments and materials concerning this rule by one of the methods listed in the **ADDRESSES** section. We will not accept comments sent by e-mail or fax or to an address not listed in the **ADDRESSES** section. Your

comment must include your first and last name, city, State, country, and postal (zip) code.

We will post your entire comment-including your personal identifying information-on *http://www.regulations.gov*. If you provide personal identifying information in addition to the required items specified in the previous paragraph, such as your street address, phone number, or e-mail address, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so.

Comments and materials we receive, as well as supporting documentation we used in preparing this rule, will be available for public inspection on *http://www.regulations.gov*, or by appointment, during normal business hours, at the Marine Mammals Management Office, U.S. Fish and Wildlife Service, 1011 East Tudor Road, Anchorage, AK 99503 (telephone 907–786–3800).

**Clarity of the Rule**

We are required by Executive Orders 12866 and 12988 and by the Presidential Memorandum of June 1, 1998, to write all rules in plain language. This means that each rule we publish must:

(a) Be logically organized;

(b) Use the active voice to address readers directly;

(c) Use clear language rather than jargon;

(d) Be divided into short sections and sentences; and

(e) Use lists and tables wherever possible.

If you feel that we have not met these requirements, send us comments by one of the methods listed in the **ADDRESSES** section. Your comments should be as specific as possible. For example, you should tell us the numbers of the sections or paragraphs that are unclearly written, which sections or sentences are too long, the sections where you feel lists or tables would be useful, etc.

**Required Determinations**

*Regulatory Planning and Review*

This document is not a significant rule, and the Office of Management and Budget has not reviewed this rule under Executive Order 12866.

(1) This rule will not have an effect of $100 million or more on the economy. It will not adversely affect in a material way the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities.

(2) This rule will not create a serious inconsistency or otherwise interfere with an action taken or planned by another agency.

(3) This rule does not alter the budgetary effects of entitlements, grants, user fees, or loan programs or the rights or obligations of their recipients.

(4) This rule does not raise novel legal or policy issues.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (RFA; 5 U.S.C. 601 et seq., as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996), whenever an agency must publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities (small businesses, small organizations, and small governmental jurisdictions). However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. SBREFA amended RFA to require Federal agencies to provide a statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities.

Based on the information that is available to us at this time, we are certifying that this special rule will not have a significant economic impact on a substantial number of small entities. The following discussion explains our rationale.

According to the Small Business Administration (SBA), small entities include small organizations, including any independent nonprofit organization that is not dominant in its field, and small governmental jurisdictions, including school boards and city and town governments that serve fewer than 50,000 residents, as well as small businesses. The SBA defines small businesses categorically and has provided standards for determining what constitutes a small business at 13 CFR 121.201 (also found at *http://www.sba.gov/size/*), which the RFA requires all federal agencies to follow. To determine if potential economic impacts to these small entities would be significant, we considered the types of activities that might trigger regulatory impacts. However, this special rule for the polar bear designated as threatened under the ESA will, with limited exceptions, allow for maintenance of the status quo regarding activities that had previously been authorized or exempted under the MMPA. Therefore, we

anticipate no significant economic impact on a substantial number of small entities from this rule. Therefore, a Regulatory Flexibility Analysis is not required.

**Unfunded Mandates Reform Act**

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.), we make the following findings:

(a) This rule will not produce a Federal mandate. In general, a Federal mandate is a provision in legislation, statute, or regulation that would impose an enforceable duty upon State, local, or Tribal governments, or the private sector, and includes both "Federal intergovernmental mandates" and "Federal private sector mandates." These terms are defined in 2 U.S.C. 658(5)-(7). "Federal intergovernmental mandate" includes a regulation that "would impose an enforceable duty upon State, local, or [T]ribal governments" with two exceptions. It excludes "a condition of Federal assistance." It also excludes "a duty arising from participation in a voluntary Federal program," unless the regulation "relates to a then-existing Federal program under which $500,000,000 or more is provided annually to State, local, and [T]ribal governments under entitlement authority," if the provision would "increase the stringency of conditions of assistance" or "place caps upon, or otherwise decrease, the Federal Government's responsibility to provide funding," and the State, local, or Tribal governments "lack authority" to adjust accordingly. At the time of enactment, these entitlement programs were: Medicaid; AFDC work programs; Child Nutrition; Food Stamps; Social Services Block Grants; Vocational Rehabilitation State Grants; Foster Care, Adoption Assistance, and Independent Living; Family Support Welfare Services; and Child Support Enforcement. "Federal private sector mandate" includes a regulation that "would impose an enforceable duty upon the private sector, except (i) a condition of Federal assistance or (ii) a duty arising from participation in a voluntary Federal program."

(b) Because this special rule for the polar bear designated as threatened under the ESA allows, with limited exceptions, for the maintenance of the status quo regarding activities that had previously been authorized or exempted under the MMPA, we do not believe that this rule will significantly or uniquely affect small governments. Therefore, a Small Government Agency Plan is not required.

**Takings**

In accordance with Executive Order 12630, this rule does not have significant takings implications. We have determined that the rule has no potential takings of private property implications as defined by this Executive Order because this special rule will, with limited exceptions, maintain the status quo regarding activities currently allowed under the MMPA. A takings implication assessment is not required.

**Federalism**

In accordance with Executive Order 13132, this rule does not have significant Federalism effects. A Federalism assessment is not required. This rule will not have substantial direct effects on the State, in the relationship between the Federal Government and the State, or on the distribution of power and responsibilities among the various levels of government.

**Civil Justice Reform**

In accordance with Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Order.

**Paperwork Reduction Act**

This special rule does not contain any new collections of information that require approval by the Office of Management and Budget (OMB) under 44 U.S.C. 3501 et seq. The rule does not impose new record keeping or reporting requirements on State or local governments, individuals, and businesses, or organizations. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number.

**National Environmental Policy Act (NEPA)**

This rule is exempt from NEPA procedures. In 1983, upon recommendation of the Council on Environmental Quality, the Service determined that NEPA documents need not be prepared in connection with regulations adopted pursuant to section 4(a) of the ESA. The Service subsequently expanded this determination to section 4(d) rules. A section 4(d) rule provides the appropriate and necessary prohibitions and authorizations for a species that has been determined to be threatened under section 4(a) of the ESA. NEPA procedures would confuse matters by overlaying its own matrix upon the

section 4 decision-making process. The opportunity for public comment-one of the goals of NEPA-is also already provided through section 4 rulemaking procedures. This determination was upheld in *Center for Biological Diversity* v. *U.S. Fish and Wildlife Service,* No. 04–04324 (N.D. Cal. 2005).

**Government-to-Government Relationship With Tribes**

The Service, in accordance with the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951), Executive Order 13175 and the Department of the Interior's manual at 512 DM 2, and Secretarial Order 3225, acknowledges our responsibility to communicate meaningfully with federally recognized Tribes on a government-to-government basis. During the public comment period following our proposal to list the polar bear as threatened (72 FR 1064), Alaska Native tribes and tribally-authorized organizations were among those that provided comments on the listing action. In addition, public hearings were held at Anchorage (March 1, 2007) and Barrow (March 7, 2007), Alaska. For the Barrow public hearing, we established teleconferencing capabilities to provide an opportunity to receive testimony from outlying communities. The communities of Kaktovik, Gambell, Kotzebue, Shishmaref, and Point Lay, Alaska, participated in this public hearing via teleconference.

**Energy Supply, Distribution or Use (Executive Order 13211)**

On May 18, 2001, the President issued Executive Order 13211 on regulations that significantly affect energy supply, distribution, and use. Executive Order 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. This rule is a not significant regulatory action under Executive Order 12866. For reasons discussed within this rule, we believe that the rule does not have any effect on energy supplies, distribution, and use. Therefore, this action is not a significant energy action, and no Statement of Energy Effects is required.

**List of Subjects in 50 CFR Part 17**

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

**Regulation Promulgation**

■ Accordingly, we amend part 17, subchapter B of chapter I, title 50 of the

Code of Federal Regulations, as set forth below:

**PART 17—[AMENDED]**

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500; unless otherwise noted.

■ 2. Amend § 17.11(h) by revising the entry for "Bear, polar" under MAMMALS in the List of Endangered and Threatened Wildlife to read as follows:

**§ 17.11   Endangered and threatened wildlife.**

\*      \*      \*      \*      \*

(h) \* \* \*

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| **MAMMALS** | | | | | | | |
| \* | \* | \* | \* | \* | \* | | \* |
| Bear, polar ............... | Ursus maritimus ..... | U.S.A. (AK), Canada, Russia, Denmark (Greenland), Norway. | Entire ...................... | T .......... | .................... | NA | 17.40(q) |
| \* | \* | \* | \* | \* | \* | | \* |

■ 3. Amend § 17.40 by adding a new paragraph (q) to read as follows:

**§ 17.40   Special rules—mammals.**

\*      \*      \*      \*      \*

(q) Polar bear (*Ursus maritimus*).

(1) Except as noted in paragraphs *(2) and (4) of subsection* (q) of this section, all prohibitions and provisions of §§ 17.31 and 17.32 of this part apply to the polar bear.

(2) None of the prohibitions in § 17.31 of this part apply to any activity conducted in a manner that is consistent with the requirements of the Marine Mammal Protection Act (MMPA), 16 U.S.C. 1361 *et seq.*, and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), provided that the person carrying out the activity has complied with all terms and conditions that apply to that activity under the provisions of the MMPA and CITES and their implementing regulations.

(3) All applicable provisions of 50 CFR parts 14, 18, and 23 must be met.

(4) None of the prohibitions in § 17.31 of this part apply to any taking of polar bears that is incidental to, but not the purpose of, carrying out an otherwise lawful activity within any area subject to the jurisdiction of the United States except Alaska.

Dated: May 14, 2008.

**Dirk Kempthorne,**

*Secretary of the Interior.*

[FR Doc. E8–11144 Filed 5–14–08; 3:15 pm]

**BILLING CODE 4310-55-P**

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| AMERICAN PETROLEUM INSTITUTE<br>1220 L Street, NW<br>Washington, D.C. 20005, et. al., | DIRK KEMPTHORNE, Secretary of the United States Department of the Interior,<br>H. DALE HALL, Director of the United States Fish and Wildlife Service, and UNITED STATES<br>FISH AND WILDLIFE SERVICE<br>1849 C Street, N.W.<br>Washington, D.C. 20240 |

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ Washington, D.C.<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ____ Washington, D.C.<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| JOHN C. MARTIN, D.C. Bar # 358679<br>DUANE A. SILER, D.C. Bar # 256339<br>MICHELE L. WALTER, D.C. Bar # 487329<br>Patton Boggs LLP<br>2550 M Street N.W.<br>Washington, D.C. 20037<br>Tel: 202-457-6000<br>Fax: 202-457-6315 | |

| **II. BASIS OF JURISDICTION**<br>(PLACE AN x IN ONE BOX ONLY) | **III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX<br>FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!** |
|---|---|

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ **A.** *Antitrust* | ○ **B.** *Personal Injury/ Malpractice* | ◉ **C.** *Administrative Agency Review* | ○ **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ **E.** *General Civil (Other)* | OR | ○ **F.** *Pro Se General Civil* |
|---|---|---|

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>\*(If pro se, select this deck)\* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>\*(If pro se, select this deck)\* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. Section 702 for review of final agency action issued at 73 Fed. Reg. 28306 (May 18, 2008)

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____ Check YES only if demanded in complaint   **JURY DEMAND:**   YES ☐   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  8/27/08   SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.